[Civ. No. 27210. First Dist., Div. Four. Aug. 31, 1970.]

JESSE NATHANIEL DAVIS, Plaintiff and Appellant, v.
THE JUSTICE COURT FOR THE PITTSBURG JUDICIAL DISTRICT
OF ALAMEDA COUNTY, Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

## COUNSEL

Gayden & Chaffee, Donald K. Gayden and James H. Chaffee for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Clifford K. Thompson, Jr., Deputy Attorneys General, for Real Party in Interest and Respondent.

## OPINION

**DEVINE, P. J.**—Appellant was denied a writ of prohibition against the prosecution of a misdemeanor complaint against him. He appeals. The charge is violation of a curfew. The alleged violation is against Contra Costa County Ordinance section 3108(c), which provides: "Section 3108.

Violations of Chapter. It shall be a misdemeanor punishable by a fine not to exceed five hundred dollars ($500), or by imprisonment not to exceed six (6) months, or both, for any person: . . . (c) During a disaster to do any act prohibited or omit to do any act required by any lawful regulations issued under this chapter, if the act or omission is of a nature to give, or be likely to give, assistance to the enemy, to imperil the lives or property of inhabitants of this county, or to prevent, hinder, or delay the defense or protection of the county."

*Facts*

On April 16, 1968, at 10 p.m., the Director of the Contra Costa County Disaster Office, pursuant to County Ordinance section 3104(f), proclaimed the existence of a "state of emergency" as to El Pueblo Housing Project, a minority housing area within the City of Pittsburg, because of riotous conditions existing therein. Simultaneously, and pursuant to County Ordinance section 3105(a), he promulgated emergency regulations, including a curfew, applicable to the housing project. On April 17, 1968, the Board of Supervisors of the County of Contra Costa ratified the director's actions, as required by Ordinance section 3104(a).

The emergency regulations were as follows:

"1. Not more than two persons will be allowed to congregate in the streets of said area.

"2. Law enforcement personnel may require identification of any person in the area at any time.

"3. A curfew is hereby established in the area from the hours of 7:00 PM to 6:00 AM. No person is to be on the streets of said area without a special permit during said hours.

"4. All homes and automobiles in the area may be searched as necessary to protect citizens and law enforcement personnel. All firearms found are to be confiscated. Said search is found to be required by the Sheriff in order to protect citizens and law enforcement personnel in the area."

Notice of the curfew and the restriction on street assemblies was published by the disaster director, and residents of the project were advised where curfew permits might be obtained. The proclamation of the existence of a state of emergency listed the following conditions of extreme peril to the safety of persons and property as warranting the imposition of the emergency curfew order:

"1. For a long period of time there has been continuous promiscuous discharge of firearms in said Housing Project.

"2. Rocks, bottles and other missiles have been thrown at vehicles going through said Housing Project.

"3. In one recent attempt to apprehend a criminal suspect on a warrant issued by the Superior Court of this County there was a coordinated attempt by persons in the area to assist the suspect to evade capture. The suspect was in the area for three days despite massive police efforts to capture him. The suspect was aided by groups of up to fifty people in his attempt to escape and gunfire was common throughout this area by residents during this time. On one occasion about fifty (50) persons were on rooftops discharging firearms.

"4. There has been vandalism to public facilities in said area.

"5. There has been harassment of public utilities employees to the extent that they only enter the area on a restricted basis.

"6. United States mail service has been interfered with in said area.

"7. Persons who live outside the area cannot enter the area without constant harassment by large groups of persons who congregate on the streets of said area.

"8. There have been threats to 'burn the area down' on numerous occasions.

"9. Residents of the area have made numerous complaints to police agencies and have appeared before the Board of Supervisors to demand that they be allowed to live a peaceful life. Said residents allege that they cannot walk the streets of the area in safety and without harassment and that their children cannot play on the streets of said area."

Appellant was arrested for violating the curfew in the early hours of April 17, 1968, by being on a street within the project while the curfew was in effect. Pursuant to the request of the El Pueblo residents and with the concurrence of the county law enforcement officials, the curfew was temporarily suspended at 2:20 p.m. on April 17, 1968, the day of appellant's arrest.

### The Subject of Preemption

The emergency regulations were passed under authority of ordinance section 3104(f), which reads: "Subject to administrative direction by the County Administrator, the Director is empowered: . . . (f) To proclaim the existence of a state of emergency or its termination. This proclamation shall be subject to confirmation by the Board of Supervisors at the earliest practicable time"; and ordinance section 3105(a), which reads: "After the declaration of a state of extreme emergency or a state of disaster as pro-

vided in Section 3104, or the declaration of a state of extreme emergency or a state of disaster by the Governor or the Director of the California Disaster Office affecting the region in which this county is located, the director is empowered: (a) To make and issue rules and regulations on matters reasonably related to the protection of life and property as affected by the disaster. These regulations must be confirmed at the earliest practicable time by the Board of Supervisors."

The regulations were approved by the board of supervisors, by resolution of April 17, 1968. The regulations, including the curfew, were specified in the resolution. In the resolution the board of supervisors added to the nine conditions, recited above, which the disaster director had described, two others, as follows:

"10. Because of the aforementioned facts, additional police personnel were assigned to said area on April 15, 1968;

"11. At 7:00 P.M. on April 16, 1968, officers of the Sheriff's Department of this County, while on routine patrol, made several arrests in said area. The police vehicle of said arresting officers was immediately surrounded by a large group of persons. Police vehicles entering the area were stoned by persons in the area. Since the arrest incident there has been constant firing at police officers and two officers have been wounded as a result of said gunfire. There is no effective law enforcement control in said area at the present time."

The board of supervisors specifically found that all of the recited conditions of extreme peril "did warrant and necessitate the proclamation of the existence of a State of Emergency" and that the regulations "reasonably related to the protection of life and property in the El Pueblo Housing Area."

We conclude that the source of power to enact regulations was the legislative action of the board of supervisors, and that the source of this legislative power is article XI, section 11 of the Constitution of California, which reads: "Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." We conclude that the state did not preempt the field of protection of life and property by extraordinary means in cases of emergency or disaster. Our reasons are these:

1) Nowhere in division 7 of the Military and Veterans Code, which has to do with preparedness against disasters and emergencies, does the Legislature express an intention to preempt the field. A careful reading of division 7 shows that although the Legislature has made provision for such matters as the organization of local war or disaster councils (Mil. &

Vet. Code, § 1571), and mutual aid regions or areas (Mil. & Vet. Code, § § 1560-1564), the Legislature has not purported to enact regulatory as distinguished from organizational measures for dealing with local emergencies.

2) At several places in the Military and Veterans Code there are expressions which give indication of intention of the Legislature to allow local agencies to act in the matter of disaster and emergency; for example, in section 1500 it is declared that it is necessary to enable the state to more effectively join with political subdivisions, municipal corporations and other public agencies of the state in preparing to cope with and guard against conditions of extreme peril. In section 1571, wherein the matter of organization of local disaster councils is described, it is provided that nothing is intended to be construed as a denial of the power of local agencies to establish defense and disaster organizations pursuant to article XI, section 11 of the Constitution. And in section 1591, relating to the responsibilities and immunities of volunteers, there is reference to "any order, rule or regulation issued or promulgated pursuant to the provisions of this chapter *or any local ordinance. . . .*" (Italics added.)

3) The field of activity of the state and of mutual aid regions necessarily is broader than that of a county, and different definitions of terms are appropriate; for example, disaster is defined in Military and Veterans Code, section 1550.01 as "a war or enemy caused calamity, such as an attack by nuclear weapons which renders unavailable a majority of the legislative body of any local agency." Disaster is defined in Contra Costa County Ordinance, section 3101(b) as follows: "Disaster shall mean actual or threatened enemy attack, sabotage, extraordinary fire, flood, storm, epidemic, riot, earthquake, or other similar public calamity, with the exception of any condition resulting from a labor controversy." It is true that some of the language in the ordinance is the same as some in the code, but essentially what is local is left unregulated by statute. (See *Galvan* v. *Superior Court,* 70 Cal.2d 851, 862 et seq. [76 Cal.Rptr. 642, 452 P.2d 930].)

4) Finally, we come to a sentence contained in Military and Veterans Code, section 1571, which reads: "Counties, cities and counties, and cities may enact ordinances and resolutions and either establish rules and regulations or authorize disaster councils to recommend to the local director of civil defense rules and regulations for dealing with local emergencies that can be adequately dealt with locally; and further may act to carry out mutual aid on a voluntary basis, and to this end may enter into agreements." It is appellant's contention that this sentence relates to dealing with "local emergencies" and local emergencies do not include riots. Appellant contends that this is so because the word "riot" does not appear in the statutory definition of "local emergency" which is given in Military and

Veterans Code section 1505 as "the existence of conditions, within the territorial limits of a local agency, in the absence of a duly proclaimed state of extreme emergency or state of disaster, which conditions are a result of an emergency created by great public calamity such as extraordinary fire, flood, storm, epidemic, earthquake or other disaster which is, or is likely to be, beyond the control of the services, personnel, equipment and facilities of that agency and require the combined forces of other local agencies to combat." In defining a "state of disaster" as this may be proclaimed by the Governor, or in his absence by the Director of the Disaster Office (Mil. & Vet. Code, § 1518.3), section 1505 gives as the requisites "such conditions as air pollution, fire, flood, storm, epidemic, *riot* or earthquake, or other conditions except as a result of war-caused disaster, which conditions, by reason of their magnitude, are or are likely to be beyond the control of the services, personnel, equipment and facilities of any single county, city and county, or city and require the combined forces of a mutual aid region or regions to combat." (Italics added.) Thus, argues appellant, the Legislature intended to give power to local agencies such as counties to enact ordinances relating to certain conditions of emergency or peril, but excepted riot as one of these.

We are not persuaded by this reasoning. The conditions described in the definition of "local emergency" in section 1505 are not exclusive, as shown by the use of the words "such as" before the enumeration, and the words "or other disaster" which follow. We observe that air pollution is not explicitly given as one of the conditions which may create a local emergency, although it is mentioned as one of the conditions which may create a state of disaster. Contra Costa County has included both air pollution and riot as conditions for the use of emergency measures such as the one taken in this case.

It is our conclusion that the sentence referred to in section 1571 was not intended by the Legislature to be an exclusive grant of power to counties, the Legislature reserving to itself the rest of the field. It seems to us that the Legislature did not intend to interfere with the powers granted to counties under article XI, section 11 of the Constitution. Rather, it appears that the expressions in sections 1571 and 1505 of Military and Veterans Code, taken as a whole, are confirmatory of the intention of the Legislature not to preempt the field.

We come now to the subject of implied preemption. Appellant contends that the legislative scheme is that of preemption, even if literal occupation of the whole field has not been accomplished by the statutes. The tests to determine whether the subject has been preempted by the Legislature are: " '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become

exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' " (*Galvan* v. *Superior Court,* 70 Cal.2d 851, 859-860 [76 Cal.Rptr. 642, 452 P.2d 930]; *In re Hubbard,* 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].) ■■■ As to the first of these, we have given examples above to show that the Legislature, far from clearly indicating that the subject matter has become exclusively a matter of state concern, has shown that local agencies are looked to by the state for effective operations of their own in meeting emergencies and disasters, as well as in joining plans for mutual aid. Applying the second test, we find nothing in the Military and Veterans Code which shows a paramount state concern which will not allow additional local action.

Finally, we consider the matter of the curfew as it may be applied to transient citizens of the state while we consider the possible benefit to counties and municipalities. It is true that a curfew, restricting as it does the right of free movement, does interfere with what ordinarily is a right of the citizenry. Obviously, the right to free movement cannot be interfered with unless extraordinary and perilous conditions exist, such as a riot, and perhaps only one of formidable dimension. (A riot is thus defined by section 404 of the Penal Code: "Any use of force or violence, disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot.") The validity and usefulness of the. curfew during dangerous conditions has been recognized in the Report of the National Advisory Commission on Civil Disorders (see concluding paragraphs). See also Frese, *The Riot Curfew,* 57 Cal.L.Rev. 450.

The very fact that curfew does impose unusual limitations on freedom of movement is a reason for believing that in the absence of clear indication by the Legislature to the contrary, the lawmakers decided to leave the subject with local representatives of the people who, presumably, would be informed of the situation quickly and accurately and who would be in position to remove the curtailment of freedom in short order. In the case before us, the curfew was geographically limited; it could not possibly have affected many transient citizens. It was imposed following the petition of inhabitants of the housing project who felt that they and their families were in danger. It was removed the very next day. Throughout the crucial days of April 16 and April 17, the legislative body of the county, and not the

executive alone, was engaged with the curfew procedure. It appears unlikely that the Legislature intended to prevent this kind of action by preemption.

## The Subject of Overbreadth

Appellant contends that the ordinances grant overbroad powers to county officials to abridge the rights of free speech, free movement and assembly, and freedom from unreasonable searches and seizures. We have discussed the matter of free movement. The rights of free speech and free assembly are not directly involved in this case. Although freedom to move about, even within a state, probably is a constitutional right (as interstate travel is: *Edwards* v. *California,* 314 U.S. 160 [86 L.Ed. 119, 62 S.Ct. 164]), it appears that is not in itself a First Amendment right (*Zemel* v. *Rusk,* 381 U.S. 1, 16-17 [14 L.Ed.2d 179, 189-191, 85 S.Ct. 1271]). There is no pleading that appellant intended to call even the smallest of assemblies, or that he wished to make any kind of speech, or even that he desired to converse with anyone. There is no allegation that he or his habitation was searched, if, indeed, he resided at El Pueblo. Although it is true that in certain cases of overbroad statutes, the courts will inquire into matters which do not affect the particular litigant (e.g., *Dombrowski* v. *Pfister,* 380 U.S. 479 [14 L.Ed.2d 22, 85 S.Ct. 1116]; *Brown* v. *Louisiana,* 383 U.S. 131 [15 L.Ed.2d 637, 86 S.Ct. 719]; *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 432-433 [9 L.Ed.2d 405, 417-418, 83 S.Ct. 328]; *Canon* v. *Justice Court,* 61 Cal.2d 446, 450 [39 Cal.Rptr. 228, 393 P.2d 428]), all of the cases of this kind which we know of have involved statutes or ordinances which are more or less permanently on the books. In our case, the proclaimed emergency terminated long ago. Besides, the curfew regulation, *prohibiting* conduct, is quite separable from that regulation which purports to *allow* search. Proper respect for the principle of judicial abstention requires that we withhold expression on the constitutionality of the ordinances in hypothetical cases.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.