Filed 2/27/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FIX THE CITY, INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF LOS ANGELES et al.,<br><br>    Defendants and Respondents. | B339464<br><br>(Los Angeles County<br> Super. Ct. No. 23STCP03519) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Affirmed.

The Silverstein Law Firm, Robert P. Silverstein and James S. Link for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Denise C. Mills, Chief Deputy City Attorney, Kathleen A. Kenealy, Chief Assistant City Attorney, Shaun Dabby Jacobs, Assistant City Attorney, Sara Ugaz and Stephen D. Lee, Deputy City Attorneys for Defendants and Respondents City of Los Angeles and Los Angeles City Council.

Patterson & O'Neill, Ryan Patterson and Brian O'Neill for Yes In My Back Yard as Amicus Curiae on behalf of Defendants and Respondents City of Los Angeles and Los Angeles City Council.

---

**INTRODUCTION**

Section 8.33 of the City of Los Angeles Administrative Code (section 8.33) confers various mayoral powers upon the declaration of "a local housing and/or homelessness emergency." (*Id.*, subd. (b).)  On July 7, 2023, City of Los Angeles Mayor Karen Bass declared such an emergency.  The Los Angeles City Council (City Council) thereafter renewed the state of emergency and Mayor Bass exercised the powers granted to her to take action regarding unhoused city residents.  On November 4, 2025, while this appeal was pending, the mayor lifted the emergency declaration and it is no longer in force.

Appellant Fix the City, Inc. (Fix the City) claims section 8.33 is invalid, such that the City of Los Angeles (City) and the City Council acted illegally during the time the emergency declaration was in place.  Fix the City asserts that the California Emergency Services Act (CESA; Gov. Code,[1] § 8550 et seq.) as well as another provision of the City's administrative code preempted section 8.33, rendering it null and void.

We conclude CESA and section 8.33 do not conflict and that CESA does not otherwise preempt section 8.33.  We also conclude other provisions of the City's administrative code (LAAC) do not

---

[1] Unspecified statutory references are to the Government Code.

2

invalidate section 8.33. As the trial court denied Fix the City's requests for a writ vacating the emergency declaration along with any directives, rules, and regulations issued under it, and for declaratory relief that section 8.33 violated CESA and other provisions of the LAAC, we affirm.

## BACKGROUND

We summarize first the pertinent provisions of CESA and the LAAC, then the Mayor's July 7, 2023 emergency declaration, and lastly the procedural history of Fix the City's lawsuit.

### A.    CESA

In CESA, the Legislature expressed its intent to coordinate the emergency responses of the state, its political subdivisions, the federal government, and "private agencies"; to provide state assistance to its political subdivisions; and to facilitate "the rendering of mutual aid" by the state and political subdivisions "to the end that the most effective use may be made of all manpower, resources, and facilities for dealing with any emergency that may occur." (§ 8550, subds. (a)-(d).)

CESA establishes three "degrees of emergency": a " '[s]tate of war emergency' " (§ 8558, subd. (a)); a " '[s]tate of emergency' " (*id*., subd. (b)); and a " '[l]ocal emergency' " (*id*., subd. (c)). Only the last of these is relevant here. A " '[l]ocal emergency,' " as defined by CESA, "may be proclaimed only by the governing body of a city, county, or city and county, or by an official designated by ordinance adopted by that governing body" (§ 8630) based on "conditions of disaster or of extreme peril to the safety of persons and property within the territorial limits of a county, city and county, or city, caused by conditions such as air pollution, fire, flood, storm, epidemic, riot, drought, cyberterrorism, sudden and

3

severe energy shortage, deenergization event,[2] electromagnetic pulse attack, plant or animal infestation or disease, the Governor's warning of an earthquake or volcanic prediction, or an earthquake, or other conditions . . . which are or are likely to be beyond the control of the services, personnel, equipment, and facilities of that political subdivision and require the combined forces of other political subdivisions to combat" (§ 8558, subd. (c)(1)).

During a "local emergency" under CESA "the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property, including orders or regulations imposing a curfew within designated boundaries where necessary to preserve the public order and safety." (§ 8634.) Other political subdivisions are provided "full power to provide mutual aid . . . in accordance with local ordinances, resolutions, emergency plans, or agreements therefor" (§ 8631) and state agencies are similarly authorized to "provide mutual aid, including personnel, equipment, and other available resources, to assist political subdivisions during a local emergency" (§ 8632).

The state and its political subdivisions are immune from liability for "the exercise or performance, or the failure to exercise or perform, a discretionary function or duty on the part of a state

---

[2] A " 'deenergization event' " is a "planned power outage . . . to reduce the risk of wildfires caused by utility equipment." (§ 8557, subd. (h).) Where a "sudden and severe energy shortage" or "deenergization event" involves a "regulated energy utilit[y]" it can be the basis for the proclamation of a " '[l]ocal emergency' " if it "requires extraordinary measures beyond the authority vested in the Public Utilities Commission." (§ 8558, subd. (c)(1).)

4

or local agency or any employee of the state or its political subdivisions in carrying out the provisions of [CESA]."  (§ 8655.) In addition, a political subdivision's "officers, agents, [and] employees," when performing any functions or duties outside of their territory pursuant to CESA, enjoy all "privileges and immunities . . . [and] exemptions from laws, ordinances, and rules[,] . . . and . . . benefits which apply to the[ir] activity" within their territory.  (§ 8656.)

Although the governing body of a political subdivision may designate an official to initially proclaim a "local emergency" pursuant to CESA, an emergency proclaimed by such an official must be "ratified by the governing body" within seven days. (§ 8630, subd. (b).)  In addition, "[t]he governing body shall review the need for continuing the local emergency at least once every 60 days until the governing body terminates the local emergency," which "shall" be done "at the earliest possible date that conditions warrant."  (*Id.*, subds. (c) & (d).)

## B. The City's Authority to Declare a "Local Housing and/or Homelessness Emergency" under its Charter and Administrative Code

The City is a charter city.  Article XI, section 5, subdivision (a) of the California Constitution provides, "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws.  City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."  This constitutional provision "was

5

originally 'enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.' [Citation.] The provision represents an 'affirmative constitutional grant to charter cities of "all powers appropriate for a municipality to possess . . ." and [includes] the important corollary that "so far as 'municipal affairs' are concerned," charter cities are "supreme and beyond the reach of legislative enactment." ' " (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 556.)

The City has invoked this constitutional "home rule" authority over its municipal affairs. (L.A. City Charter, vol. I, art. I, § 101 (Charter).) The Charter authorizes the mayor to "declare a local emergency and coordinate the City's emergency response activities in accordance with procedures established by ordinance." (Charter, vol. I, art. II, § 231, subd. (i).) The Charter does not define the term "local emergency" as used in it, but the coordination it discusses involves only City resources and not (as CESA's definition of the same term does) "the combined forces of other political subdivisions." (§ 8558, subd. (c)(1).)

The LAAC provides for a mayoral declaration of a " '[l]ocal [h]ousing and/or [h]omeless [e]mergency,' " which is defined as "a local emergency due to the existence of a critical shortage of local affordable housing and/or an emergency on homelessness." (§ 8.33, subd. (a).) "The [m]ayor is . . . empowered to declare the existence of a local housing and/or homelessness emergency" if the City's housing supply and the number of homeless

individuals living in the City meet certain metrics.[3] (*Id.*, subd. (b)(i), (ii).) Upon the mayor's declaration of such an emergency, the mayor "shall coordinate citywide planning and response with respect to unsheltered or unhoused individuals in conjunction with" various City departments and agencies and "coordinate the City's efforts to address" the emergency "with the County of Los Angeles, the State of California, and the federal government." (*Id.*, subd. (c).) Furthermore, during such a state of emergency, the mayor is empowered to "[p]romulgate, issue and enforce rules, regulations, orders and directives which the Mayor considers necessary to address the emergency," "[c]ommandeer property deemed necessary to meet interim and temporary housing needs and bind the City for the fair value," "[r]equire emergency service of any City officer or employee and requisition necessary personnel or material of any City department or agency," "[o]rder any action relative to the procurement of construction contracts, service provider contracts, supplies, and

---

[3] To proclaim an emergency under section 8.33, the mayor must find that "(i) The City's housing supply is projected to be at least 40 percent below its annual housing production goals as established in the Housing Element approved by the State Department of Housing and Community Development and reported in the City Planning Department's quarterly Housing Production Report; and/or [¶] (ii) Homelessness in the City has reached a crisis as indicated by either: [¶] (1) The unhoused population in the City is greater than two times the total number of interim beds as established in the annual Homeless Inventory Count submitted to the federal Department of Housing and Urban Development; or [¶] (2) There is a citywide increase by more than 20 percent in a single year as reported in the annual Point-in-Time Count." (§ 8.33, subd. (b).)

equipment for homelessness facilities to safeguard life, health or property caused by the emergency" and, subject to some restrictions, "[s]uspend competitive bidding restrictions" set forth in the Charter and LAAC.  (§ 8.33, subd. (d)(i)-(v).)

**C.     Other Emergency Authority in the LAAC**

Separate and distinct from any emergency related to local housing/homelessness under section 8.33, the LAAC separately empowers the mayor "to declare the existence of a local emergency or disaster when he [or she] finds that any of the circumstances described in [LAAC s]ection 8.22 . . . exist, or at any time a disaster or local emergency is declared by the President of the United States or the Governor of California." (LAAC, § 8.27.)  LAAC section 8.22 defines " 'local emergency' " as "any occurrence which by reason of its magnitude is or is likely to become beyond the control of the normal services, personnel, equipment and facilities of the regularly constituted branches and departments of the City government."  During a "local emergency," the mayor is provided with similar powers as are conferred during a "[l]ocal [h]ousing and/or [h]omelessness [e]mergency."  (See *id*., §§ 8.29, 8.30.)

**D.     Mayor Bass Declares an Emergency under Section 8.33**

On July 7, 2023, Mayor Bass declared an emergency under section 8.33.  On October 31, 2023, the City Council adopted a resolution "[affirming] that the local emergency [concerning persons experiencing homelessness declared by the Mayor on July 7, 2023] did exist . . . and . . . there is a need to renew the declaration of local emergency."  On January 23, 2024, the City Council adopted a resolution further continuing the emergency.

8

On November 4, 2025, the Mayor lifted the emergency declaration.

### E. Fix the City Challenges Mayor Bass's Declaration of Emergency

On September 23, 2023, while the homelessness emergency declaration was in place, Fix the City sought writ and declaratory relief against the City and the City Council challenging that emergency declaration.[4]  In the operative petition and complaint, Fix the City sought to require the City to vacate the Mayor's July 7, 2023 emergency declaration and any directives, rules, and regulations issued under it.  Fix the City argued the declaration was not ratified by the City Council within seven days as required by section 8630 and not reviewed by the City Council every 60 days as required by section 8630.  Fix the City also sought a declaration that section 8.33 (1) violated CESA because a lack of housing and homelessness are not grounds for a " '[l]ocal emergency' " under section 8558 and because section 8.33 does not require City Council ratification or rescission of an emergency declaration within seven days, nor City Council review every 60 days, as required by section 8630; and (2) violated the LAAC by establishing a type of local emergency inconsistent with the definition of "local emergency" in LAAC section 8.22.[5]

---

[4] Fix the City also named Mayor Bass as a defendant in her official capacity but later dismissed her.

[5] Although the emergency declaration is no longer in place, this appeal is not moot because Fix the City's lawsuit challenged the validity of section 8.33, which remains part of the LAAC.  Fix the City asserted additional grounds for relief before the trial

9

Respondents filed a demurrer on February 16, 2024. As relevant to this appeal, respondents contended that Fix the City's mandamus claim failed because section 8630 does not apply to charter cities and, even if it did, because section 8.33 addresses a municipal affair the ordinance would be enforceable despite any conflict with section 8630. Respondents further contended that Fix the City's declaratory relief claims, which were based on the premise that section 8.33 violated CESA and was inconsistent with LAAC section 8.22, failed.

Fix the City contended in its opposition that CESA applies to charter cities and preempts local legislation concerning local emergencies. Fix the City further contended that the City could not legislate for a local emergency based on a housing shortage or homelessness because those were not grounds for a " '[l]ocal emergency' " under section 8558, subdivision (c)(1), and CESA preempted the field.

In their reply, respondents contended that, even if CESA applies to charter cities, it does not preempt contrary local ordinances such as section 8.33.

After holding a hearing on the demurrer, the trial court solicited supplemental briefing on the pertinent LAAC sections and whether CESA's legislative history showed the Legislature intended CESA to apply to charter cities. In its supplemental briefing, Fix the City contended that section 8.33 "illegally permits a declaration of local emergency" based on conditions that do not fall with the definition of "local emergency" in LAAC section 8.22.

court but, as it has abandoned those arguments on appeal, we do not summarize them.

10

On May 30, 2024, the court sustained the demurrer without leave to amend. Among other things, the court concluded that section 8630 does not apply to charter cities because the Legislature did not clearly evince such an intent in the statute. The court also concluded the definition of "local emergency" in LAAC section 8.22 did not apply to section 8.33.

On June 5, 2024, the court entered a judgment of dismissal. Fix the City timely appealed.

## DISCUSSION

### A.    Standard of Review

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) The trial court's reasoning does not bind us, and we may affirm the judgment if it was correct under any theory. (*One Technologies, LLC v. Franchise Tax Bd.* (2023) 96 Cal.App.5th 748, 759.)

11

The interpretation of statutes and city codes are issues of law which we review de novo. (*David S. Karton, a Law Corp. v. Musick, Peeler & Garrett LLP* (2022) 83 Cal.App.5th 1027, 1040; *People v. Venice Suites, LLC* (2021) 71 Cal.App.5th 715, 725.)

## B. CESA Does Not Preempt Section 8.33

The parties and amicus curiae spill considerable ink over whether section 8630—which governs who may proclaim a "local emergency" under CESA and how long such a proclamation may remain in place—applies to charter cities such as the City. We need not resolve that question because even if CESA applies to charter cities, the City was empowered to enact section 8.33 because the ordinance does not conflict with CESA.

### 1. *Applicable Legal Framework*

"The California Supreme Court has developed a four-part 'analytical framework' to determine whether a state law unconstitutionally infringes the home rule authority of charter cities granted by article XI, section 5 of the California Constitution. [Citations.] First, the court determines whether the local law at issue regulates an activity that can be characterized as a municipal affair. [Citations.] Second, the court determines whether there is an actual conflict between state law and the local law. [Citations.] If no conflict exists, the analysis is complete and there is no need to go to the next step. [Citation.] Third, the court decides whether the state law addresses a matter of ' "statewide concern." ' [Citations.] Fourth and finally, the court determines whether the state law is ' "reasonably related to . . . resolution" ' of the identified statewide concern and is ' "narrowly tailored" to avoid unnecessary interference in local governance.' " (*City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243, 255.)

12

If there is not "an actual conflict between" the state statute and charter city legislation, "a choice between the conclusions 'municipal affair' and 'statewide concern' is not required." (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16; accord, *Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1054-1055.)

  2. *Analysis*

We address only the first two parts of this test because section 8.33 is a matter of municipal concern and it does not conflict with CESA.  Because no conflict exists, "the analysis is complete [at the second step] and there is no need to go" further. (*City of Huntington Beach v. Becerra*, *supra*, 44 Cal.App.5th at p. 255.)

With regard to step one, section 8.33 concerns a "municipal affair" because it governs the City's own response to conditions exclusively within its territory and provides powers to its executive (the mayor) to address those conditions.  (*City of Huntington Beach v. Becerra*, *supra*, 44 Cal.App.5th at p. 255.) Section 8.33 thus falls squarely within the City's home rule authority.

With regard to step two, there is no "actual conflict" between section 8.33 and CESA.  (*California Fed. Savings & Loan Assn. v. City of Los Angeles*, *supra*, 54 Cal.3d at p. 16.) CESA authorizes political subdivisions to proclaim the type of emergency described in the act; it does not limit political subdivisions from declaring other types of emergencies.  CESA and section 8.33 define the types of emergencies to which they apply in very different terms.  Section 8.33 governs a specific type of emergency arising from a housing shortage and/or homelessness, and the triggering levels of such conditions are

13

specific and limited to those within the City—a shortage of housing units in the City and the presence of unhoused people in the City.  In contrast, CESA defines emergencies which a political subdivision can proclaim as "conditions of disaster or of extreme peril to the safety of persons and property" which are caused either by specific types of events (such as floods and fires but not including homelessness or a lack of housing) or "other conditions" which are beyond the control of the political subdivision's resources and require assistance from other political subdivisions.  (§ 8558, subd. (c)(1).)

Section 8.33 also does not conflict with CESA because it provides the mayor with different powers than CESA does.  Although both section 8.33 and CESA confer the power to issue orders and regulations to address the emergency (compare § 8631 with § 8.33, subd. (d)(i)), section 8.33 confers additional powers related to the City's own personnel, departments, resources, and ordinances, and also authorizes the mayor to "commandeer property . . . and bind the City for the fair value thereof."  (§ 8.33, subd. (d)(ii)-(v).)  CESA, in contrast, benefits the political subdivision proclaiming the emergency by permitting it to receive mutual aid from other political subdivisions and the state (and to more effectively combat the disaster by providing aid to other political subdivisions dealing with the same conditions).  (§§ 8631, 8632.)  In addition, CESA expressly provides a political subdivision declaring a "local emergency" with immunities and protects the officials, employees, and agents of the political subdivision when they assist other political subdivisions.  (§§ 8655, 8656.)  Section 8.33 itself lists no such protections.

Fix the City contends that section 8.33 conflicts with CESA because CESA preempts the field of local emergencies.  We

14

disagree.  Preemption is present "when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality [citations]."  (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 898.)

The Legislature has not expressed an intent in CESA to occupy the field of local governmental response to emergency or harmful conditions within local borders, particularly with regard to charter cities and their constitutional authority to regulate their own affairs.  To the contrary, the Legislature has expressed the opposite intention in section 8668, subdivision (b), which states, "Nothing in [CESA] shall be construed to diminish or remove any authority of any city, county, or city and county granted by [s]ection 7 of [a]rticle XI of the California Constitution."  That constitutional provision establishes that "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  (Cal. Const., art. XI, § 7.)

Nor does CESA " 'so fully and completely cover[] [the area of emergency declarations] . . . as to clearly indicate that it has become exclusively a matter of state concern.' " (*Sherwin-*

15

*Williams Co. v. City of Los Angeles*, *supra*, 4 Cal.4th at p. 898.)
The definition of " '[l]ocal emergency' " in section 8558,
subdivision (c)(1) is not all-inclusive.  The definition is focused on
specific conditions which can affect more than one political
subdivision at a time or spread from one to another, and its
catch-all provision expressly refers to conditions "which are or are
likely to be beyond the control of the services, personnel,
equipment, and facilities of that political subdivision and require
the combined forces of other political subdivisions to combat."
(*Ibid*.)  In turn, section 8630 places procedural requirements only
on the proclamation and continuation of a " '[l]ocal emergency' "
as defined in section 8558, subdivision (c)(1).  In sum, these
sections serve to facilitate coordination and mutual aid among
the state, its political subdivisions, and others in responding to
emergencies—not to preempt a city from using its own resources
to address issues unique to it.[6]

　　Fix the City contends, "[s]ections 8550, 8558 and 8630 . . .
express the Legislature's intent to fully and completely occupy
the field of emergencies by declaring that emergencies are the
State's responsibility and by empowering the Governor and local
governments to declare emergencies that trigger coordination of

---

　　[6] For the reasons discussed, sections 8558, subdivision (c)
and 8630 are not " 'couched in such terms as to indicate clearly
that a paramount state concern will not tolerate further or
additional local action.' " (*Sherwin-Williams Co. v. City of Los
Angeles*, *supra*, 4 Cal.4th at p. 898.)  Fix the City does not contend
that section 8.33 imposes any " 'adverse effect . . . on the
transient citizens of the state' " and we are unaware of any such
effect which could outweigh the benefits of the ordinance to the
City.  (*Sherwin-Williams Co.*, *supra,* at p. 898.)

16

emergency services across the political subdivisions of this State." None of these sections evinces any legislative intent to restrict local entities from legislating responses to types of emergencies not addressed in CESA, to impose conditions or limitations on actions taken by a political subdivision to address disasters within its territory, or to make emergencies solely a state responsibility. Section 8550 references the state's "responsibility" to address and prepare for emergencies, but this does not suggest that political subdivisions do not also have parallel responsibilities with respect to their residents, or that local efforts to address emergencies necessarily conflict with state efforts. Fix the City appears to suggest that local legislation is inimical to coordination among the state and its political subdivisions in their emergency responses but fails to articulate in practice how this is necessarily so or why every localized emergency is one size fits all. In any event, merely providing for coordination does not evince an intent to preclude local legislation on the topic of emergencies.

Lastly, Fix the City contends that "only CESA empowers the declaration of local emergencies." Not so. Under our state constitution, "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws" (Cal. Const., art. XI, § 7), and this provision authorizes local governments to enact ordinances allowing for the declaration of a local emergency (*Davis v. Justice Court* (1970) 10 Cal.App.3d 1002, 1007).

## C. LAAC Section 8.22 Does Not Render Section 8.33 Invalid

LAAC section 8.22 defines a " 'local emergency' . . . [to] mean any occurrence which by reason of its magnitude is or is

17

likely to become beyond the control of the normal services, personnel, equipment and facilities of the regularly constituted branches and departments of the City government."  Fix the City contends that the conditions supporting an emergency declaration under section 8.33 do not constitute an "occurrence" as defined by LAAC section 8.22 and therefore section 8.33 is invalid.  This argument is meritless.

"Established rules of statutory construction are equally applicable to municipal ordinances," including that " ' "the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." ' " (*Chun v. Del Cid* (2019) 34 Cal.App.5th 806, 815.)

The City Council enacted section 8.33 *after* LAAC section 8.22.  It therefore either understood the conditions upon which an emergency could be declared under section 8.33 to constitute an "occurrence" as that term is used in LAAC section 8.22, or intended to establish an additional type of emergency under its authority to do so.  (*Chun v. Del Cid*, *supra*, 34 Cal.App.5th at p. 815; see *Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 634 [" 'If conflicting statutes cannot be reconciled, later enactments supersede earlier ones [citation], and more specific provisions take precedence over more general ones' "].)  Either way, the two provisions do not conflict.

## D.    Denial of Leave to Amend

Fix the City has not shown how it could amend its allegations to state a viable claim.  Therefore, the trial court did not err in sustaining respondents' demurrer without leave to amend.

18

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

CERTIFIED FOR PUBLICATION


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.